**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| Amor Paulina Hirst, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No.: 6:13-cv-00729-JMC |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Xavier Emanuel Guillau Salvatore | ) | |
| Tiberghien, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Before the court is Petitioner Amor Paulina Hirst's ("Petitioner" or "mother") Verified Petition for Return [Dkt. No. 1] of the parties' two minor children to the United Kingdom, brought pursuant to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. 11601 *et seq*. ("ICARA"). The children, M.S.T., age ten (10), and A.D.T., age nine (9), (collectively, the "children") have been retained in the United States by their father, Xavier Emanuel Guillau Salvatore Tiberghien ("Respondent" or "father") without Petitioner's consent since January 8, 2013.

## I. PROCEDURAL BACKGROUND

Petitioner filed the instant petition and a Motion for Order to Show Cause [Dkt. No. 3] on March 19, 2013, after Respondent failed to return the parties' two children to the United Kingdom following the children's visit with their father in Greer, South Carolina,[1] over the Christmas holiday. Petitioner first sought the administrative return of

_____

[1] Greer is a suburb of Greenville, South Carolina.

the children by filing an Application for Return of the Children with the Central Authority for England and Wales. The Central Authority for England and Wales subsequently transmitted the Application to the United States Central Authority, which attempted to negotiate Respondent's voluntary return of the children. Respondent answered in an email that he would not return the children, alleging various acts of neglect and mistreatment of the children by Petitioner and asserting that the children wished to remain with Respondent in the United States. Petitioner sought legal counsel in the United States and timely filed her Petition for Return in this court. Following a Rule to Show Cause hearing on March 29, 2013, where both Petitioner and Respondent appeared with their respective counsel, Respondent filed an Answer [Dkt. No. 28] to the Petition for Return on April 3, 2013, which he twice amended as a result of Petitioner's objections to the inadequacy of his answer. [Dkt. Nos. 41 and 51].

The court *sua sponte* issued an Order Appointing a Guardian Ad Litem [Dkt. No. 29] to conduct an independent, balanced and impartial investigation for the court into the facts relevant to the Petition for Return and the defenses raised by Respondent. The Guardian Ad Litem ("GAL")[2] conducted in-person interviews with the children individually, Respondent and his wife, as well as Skype interviews with Petitioner and her husband.[3] The GAL also contacted friends of the parties and several of the children's

_____

[2] The court appointed a lay GAL who is represented by counsel.

[3] Following the GAL's interview with Petitioner, Petitioner's counsel filed an Emergency Motion to Strike the Guardian Ad Litem [Dkt. No. 33] based on objections to the GAL's statement that she was interviewing Petitioner to determine the best interest of the child in violation of this court's order and the Hague Convention's scope of inquiry. In an Order [Dkt No. 39] denying Petitioner's motion, the court recognized the GAL's need to ask certain questions which might overlap with a "best interest of the child" inquiry. The court instructed the GAL to conduct an additional interview with Petitioner, reminding

teachers in Manchester, England. Upon the completion of her investigation, the GAL issued a report containing a summary of her investigation, which essentially provided the court with a timeline of the relevant events and previewed the arguments that the parties eventually made at trial. The GAL acknowledged that she could provide no expert opinion as to the maturity of the children, but asserted that the children's desire to remain with their father was strong. The GAL provided a copy of the report to the court and the parties on April 22, 2013. The court entered the report into evidence at trial as its own exhibit.

This court held a bench trial on April 29, 2013. Over the course of the one-day trial, the court heard testimony from Petitioner, her husband, Jamie Hirst ("Jamie"), Petitioner's Expert, Simon Craddock (who provided testimony about family law and child custody procedures in the United Kingdom), and Respondent.[4] The court also interviewed the children on the record *in camera* outside the presence of the parties and their counsel.

After receiving the testimony, carefully considering all the evidence, weighing the credibility of the witnesses, reviewing the exhibits and briefs, and studying the applicable law, this court makes the following Findings of Fact and Conclusions of Law[5] pursuant to

---

her of the proper scope of inquiry and further instructing her to avoid making any conclusions of law reserved for the court. The court also granted Petitioner's request that the GAL's report be made available to the parties.

[4] Although Petitioner had previously requested that the GAL make herself available to testify at trial, neither party chose to call her to the stand.

[5] In an effort to resolve the case as expeditiously as possible and to give the parties time to make the appropriate preparations, the court issued a short Order (Dkt. No. 59) the day after the hearing, granting Petitioner's request for return and promising a formal order within five (5) days thoroughly setting forth the basis of the court's judgment.

Fed. R. Civ. P. 52. The court notes that, to the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as such, and to the extent any Conclusions of Law constitute Findings of Fact, they are so adopted.

## II. FINDINGS OF FACT

**A. Timeline**

1.  Petitioner and Respondent were married on May 17, 1996, in South Africa. They have two male children – M.S.T., born in 2002, and A.D.T., born in 2003 – both born in Johannesburg, South Africa. At the time of the trial, M.S.T. was ten (10) years old and A.D.T. was nine (9) years old.

2.  The children are citizens of South Africa by virtue of their birth in South Africa and hold South African passports. The children also hold Belgian passports by virtue of their father's Belgian citizenship. Their Belgian passports afford the children European Union citizenship, which thereby allows them to live in the United Kingdom with no additional visa or immigration requirements.

3.  The parties and the children lived together as a family in South Africa until the parties separated in May 2007. The parties were divorced on July 25, 2008. At the time of the divorce, the parties entered into a Parenting Plan and Settlement Agreement (the "South African Order"), which was adopted by a South African High Court. The South African Order resolved all issues of custody of M.S.T. and A.D.T., giving the parties joint parental responsibility for the children. It further provided that the children should reside with their mother and should have extensive contact with their father.

4.  Following the separation, Respondent left Johannesburg and took a job in Ballito, South Africa, roughly 380 miles from Johannesburg. Petitioner experienced some

trouble with the children's behavior following Respondent's relocation, including an incident where the older child, M.S.T., attempted to run away. Several months following the divorce, the parties mutually agreed that the children would live with their father in Ballito. The children lived with their father from September 2008 to on or around February 2011.

5. When Respondent decided to relocate to Greer, South Carolina, on or around February 2011, he and Petitioner agreed that she would resume custody of the children until Respondent was established and could arrange for the children to join him in the United States. These plans changed on or around June 2011 due to Respondent's inability to raise the funds necessary to arrange for the children's visas and their travel to the United States. Petitioner has retained physical custody of the children since on or around March 2011.

6. On or around October 15, 2011, Petitioner married Jamie Hirst, a citizen of the United Kingdom. They originally met online and began a relationship in or around April 2010 while the children were living with their father. The children met Jamie for the first time during the week before Petitioner and Jamie's wedding.

7. On November 5, 2011, Petitioner and the children relocated from South Africa to Manchester, England in the United Kingdom and moved into Jamie's two-bedroom flat. Respondent arranged for the children to receive their Belgian passports, which enabled the children to enter and live in the United Kingdom. Respondent also provided Petitioner with his written consent for the children to travel from South Africa to the United Kingdom.

8. Upon arrival, Petitioner enrolled the children in Norden Community Primary School

("Norden School").  The boys also enrolled in numerous sporting activities and clubs through school and through community groups.  The children have attended the Norden School since their arrival in November 2011 and up until December 2012 when they left for their Christmas vacation with Respondent in the United States.

9.  The Norden School's End of Year Report for M.S.T., dated July 2012, indicates that the child "settled well" into his new school and "made some good progress."  [Dkt. No. 1-8 at 37].  His teacher wrote that M.S.T. was a kind, helpful and polite boy whose confidence continued to develop over the school year.  *Id.*  The End of Year Report for A.D.T. states that he had "a rather difficult start . . . settling into a new culture and way of working" at the Norden School.  [Dkt. No. 1-8 at 38].  However, his teacher commented on an improvement in A.D.T.'s attitude, a new enthusiasm for learning, and the boy's "lovely sense of humor" that helped him make friends.  *Id.*

10.  Both Petitioner and the children registered for medical care through the United Kingdom's National Health Service (the "NHS").  A.D.T suffered a fainting spell at school and hit his head in or around September 2012.  He received treatment at the Royal Oldham Hospital and was kept overnight for observation. He was released the next day with no request or instruction for follow-up treatment and with no imposed limitations on his activities.

11.  On December 23, 2012, the children travelled from the United Kingdom to the United States to visit Respondent at his new home in Greer, South Carolina.  This was the children's first visit to the United States.  The parties and the children all agree that the trip was intended to be a three-week visit, not a permanent relocation.  The parties agreed that the children would return on January 7, 2013, which was the first day school

resumed after the Christmas holiday. Since the children would be travelling on the first day of school, Respondent applied for and obtained special permission from the Norden School for the children to be absent from school on January 7, 2013. Respondent stated the children would be returning to school on January 8, 2013.

12.    On January 2, 2013, Respondent informed Petitioner by Skype that he would not be returning the children to the United Kingdom as previously agreed and would instead have the children live permanently with him in Greer, South Carolina. Petitioner objected to Respondent's unilateral decision. The parties communicated by Skype again on January 5, 2013. Respondent reasserted his intention to keep the children with him in the United States.

13.    When Respondent did not return the children to the United Kingdom on January 7, 2013, Petitioner began preparing her Application for Return of the children with the assistance of the Central Authority for England and Wales, on the basis that Respondent's retention of the children violated her rights of custody under the South African Order and constituted child abduction under the Hague Convention. The Application, filed on January 8, 2013, was subsequently transmitted to the United States Central Authority.

14.    On January 16, 2013, the United States Central Authority sent Respondent a Voluntary Return Letter notifying him of Petitioner's Application and inquiring as to whether he would voluntarily return the children to the United Kingdom.

15.    On February 7, 2013, Respondent contacted the United States Central Authority and confirmed he would not agree to the children's return to the United Kingdom. Respondent's email response expressed concern for the safety of the children if he were to return them to their mother's care in the United Kingdom. Respondent made

allegations of neglect by Petitioner as well as allegations of possible sexual, physical and verbal abuse by Petitioner.[6]   Respondent also expressed concern about the children's living conditions, their safety while walking to school on a busy street, their apparent habit of eating a dinner after 8:00 PM, the lack of a proper dinner table, Petitioner's drinking and smoking, and Petitioner's alleged habit of oversleeping in the morning, leaving the children alone to make breakfast and ready themselves for school.

16.  As part of his neglect and physical abuse claim, Respondent asserted that Petitioner ignored A.D.T.'s continuing headaches and dizzy spells which began after A.D.T.'s fainting episode in September 2012.  In February 2013, Respondent had A.D.T. evaluated by a pediatrician and ultimately a pediatric cardiologist, who found that A.D.T.'s fainting episode and subsequent dizzy spells were consistent with benign neurocardiogenic syncope.  A.D.T. was advised to avoid caffeine, to increase his fluid intake and to avoid contact sports and activities with a high likelihood of head injury until his primary physician cleared him for such activity.

17.   In March 2013, Petitioner secured pro bono counsel in the United States and subsequently filed a Verified Petition for Return with this court.

18.  Petitioner and Jamie came to the United States for the Show Cause hearing held on March 29, 2013.  At the end of the hearing, Petitioner requested visitation with the children while in the United States, which the court granted.  The children initially refused to leave the courthouse with Petitioner and Jamie. The court met with the children briefly, assured them that the visitation was limited to no more than five hours a

---

[6] The allegations contained in Respondent's email formed the basis of Respondent's "grave risk of harm" defense in his second amended complaint [Dkt. No. 51].

day, and convinced the children to participate. M.S.T. decided not to accompany Petitioner, Jamie and A.D.T. on some of the visits.

19. The children have continued to express an unwillingness to return to Manchester to live with their mother and continued to assert that they wish to stay with their father in the United States. The children's tourist visa, which was valid for 90 days, expired on or around March 23, 2013.

## B. The Parties' Testimony

20. At the trial, Petitioner testified about her divorce from Respondent and described how the parties' original plan for the children to relocate with Respondent to the United States failed due to Respondent's inability to make the proper arrangements for the relocation. She described moving with the children from South Africa to the United Kingdom, noting the children's success in school and their achievements in various sports. Petitioner entered numerous photos into the record showing the children playing in a nearby park. The photos and Petitioner's testimony painted a picture of life with the children in Manchester that was pleasant and without significant strife.

Petitioner vehemently denied Respondent's allegations of physical, sexual and verbal abuse. She explained her tendency of leaving the bathroom door open while the children take showers, which Respondent viewed as a sign of potential sexual abuse, as a means by which to allow the moisture in the room to dissipate, rather than a means of demeaning the children or invading their privacy. Petitioner further denied Respondent's allegations that she was starving the children and inflicting psychological torture by forcing the children to watch videos of plane crashes and tornadoes. Petitioner also denied trying to prevent the children from talking with their father and denied ever telling

the children that their father had abandoned them.  Petitioner's only explanation for the allegations made by Respondent was that he was engaged in a campaign to discredit her in an effort to win custody of the children.

Petitioner also described the visitation outings with the children, which were ordered following the show cause hearing.  She described the children as excited and verbal during their first visit, but withdrawn after returning from having spent time with Respondent.  Petitioner opined that the children are not free to be themselves around Respondent, who she believes has significantly influenced the children's behavior and opinions.

Petitioner testified to the numerous preparations she made for the children's return.  First, she stated that the children's school is fully supportive of the children's return and committed to their reintegration.  Petitioner stated that she also scheduled an immediate appointment with the children's general practitioner who has been forewarned that both children will require an evaluation to determine the children's need for a psychologist.  She also contacted the Child and Adolescent Mental Health Services to arrange for individual and family counseling.  She stated that such treatment is part of the United Kingdom's National Health Service, which will allow her to access these services at no charge.

While Petitioner believed that both children were smart, even gifted, she did not believe that they were mature enough to decide where and with whom they should live.

21.    Respondent's testimony painted Petitioner as a person who was excited by the prospect of having Respondent take the children to the United States so that she could enjoy a more carefree life.  He also asserted that in giving his permission for the children

to relocate to the United Kingdom, he had not intended to give Petitioner permanent physical custody of the children.

Respondent defended his claims of neglect and abuse. Respondent explained his allegations of possible sexual abuse referring to Petitioner's requirement that the children shower with the bathroom door open and noting that the children seemed to be exhibiting psychological distress. He claimed that the combination of those facts raised a red flag, and while he did not inquire with the children further, he contacted the county sheriff and sought counsel from an attorney to find out what could be done. Respondent also referred to an incident of physical abuse, in which a baby-sitter in South Africa allegedly hit the children with a belt, and he realleged that Petitioner regularly verbally abuses the children using foul language. Respondent was also concerned that Petitioner allows the children to walk to school despite the heavy traffic in the vicinity of their home and school, that she lets them go out at night by themselves, and that the children are free to roam as they please.

Respondent testified that he wanted the children to have an open relationship with their mother and that he wanted them to feel as though they had some freedom to choose where they wanted to live. Both boys, he testified, were of sufficient maturity and intelligence such that he regularly took their views into account and would do so in their decision about where they wanted to live.

**C. *In Camera* interview with children.**

22. The court interviewed A.D.T. and M.S.T. separately *in camera* in the presence of the court reporter, a law clerk, and a courtroom deputy.

23.  A.D.T. is nine (9) years old, nearly ten (10).  At the *in camera* hearing, A.D.T. seemed more nervous and reserved than he did during the court's previous interaction with him on March 29, 2013.  A.D.T. stated that he understands the differences between truth and a lie, and he agreed to answer the questions truthfully.

A.D.T. stated that he did not like his school in Manchester but he liked his teachers, especially his sports teachers.  A.D.T. explained that he enjoyed participating in trampoline, cricket and gymnastics at school.  He also stated that he had three friends in Manchester, one of whom he wrote to during his stay in the United States.  A.D.T.'s principle complaints regarding Manchester are that it is cold, that the people are not friendly when they pass in the streets, and that he did not have a proper place to play, though he also talked about playing in the park near his house.

A.D.T.'s primary objection to returning has to do with complaints about his mother.  A.D.T. believes that his mother lied to him and his brother when she told them that their father left South Africa because he fell in love with another woman. A.D.T. believes his father's explanation that he left South Africa to seek career opportunities and that he always planned to fetch the children once he was established.  Further, A.D.T. complains that his mother curses at him and his brother, that she shouts at them to do their homework or change clothes, that she does not prepare them breakfast before school, and that she rarely plays with them outside.  A.D.T. also complained that they do not get to watch television except early in the morning because Jamie is playing video games in the afternoons.  A.D.T. also asserts that his mother made him watch videos showing planes crashing, tornadoes and a shooting which he believes took place in

Canada before their trip to the United States.  These scenes made him frightened to travel to the United States.

A.D.T. likes being in the Greenville area and immediately talked about his favorite fast food restaurants in town.  He also stated that his father plays football with him and his brother and is teaching them to play tennis.  The children are not in school, but his father's wife, assisted occasionally by her mother, help the children with lessons in reading, writing and math workbooks.  A.D.T. stated that he knew he was just coming to the United States for a visit but later stated that he thought he was coming here to live permanently when he came in December.

A.D.T. stated that his visitation with his mother following the show cause hearing was fun, but that his mother acts differently in Manchester.

A.D.T. also expressed some jealously of Jamie, noting that his mother buys Jamie presents but does not do the same for the children.

When asked how he felt about his mother, A.D.T. said, "I don't really."  When asked the same about his father, A.D.T. nodded and said "I don't know what to say."

24.  M.S.T. is ten (10) years old.  He seemed more confident and somewhat happier than in the previous meeting with the court.  He stated that he knew the difference between the truth and a lie and he agreed that he would answer questions truthfully.  When asked whether he understood the proceedings, he stated that he realized that the court was deciding whether he would live with his mother or his father.  He also stated that he understands what judges do based on several television crime dramas that he has watched since coming to the United States, which he seems to enjoy a great deal.

M.S.T. stated that Manchester was "a bit miserable" though he liked the woodworking class at his school and he enjoyed participating in sports including basketball, swimming, trampolining, soccer and cricket.  He claims he has two friends there whom he has been unable to contact since his visit to the United States.  M.S.T. briefly mentioned an incident of bullying at his school, but instead of describing the actual event, he immediately shifted his narrative to complaining that his mother had not addressed the bullying issue with his school teachers.

M.S.T. stated that home life in the United Kingdom was "not good," and that he and his mother get into arguments about the children's father and about cleaning their bedroom.  When asked how he feels about his mother, he stated that his mother ignores him and his brother, is grumpy and miserable, and busies them with homework.  M.S.T. also opined that he did not think that his mother cared about him and his brother, at least not in the same way she cares about Jamie.

M.S.T. stated that he loves the Greenville area and thought it was better than either the United Kingdom or South Africa.  Like A.D.T., M.S.T prefers the weather in Greenville to the weather in Manchester.  He also noted the friendliness of the people, as well as the fact that he has a yard to play in here, whereas he often plays in the street in Manchester.   Like A.D.T., M.S.T. also enjoyed the fact that his father played football and soccer with them almost every day.  He also enjoyed going fishing on his father's new boat.    Additionally, he made friends with a neighbor's child, met his cousins who live in North Carolina, and expressed a love for his new grandmother, as well as the cats at his father's house.  M.S.T. stated that his father's wife, and occasionally her mother, help him with schoolwork in art, language, writing, math and reading workbooks.

When asked directly by the court where he wanted to live, M.S.T. stated that he "wanted to live with my dad mostly because I enjoy being with him."  He reasserted his desire to live with his father several times throughout the interview.

When asked about the visitation with his mother, M.S.T. stated that "it was a little bit alright" but then stated that there was nothing good about the visit.  He stated that he was shocked to see her since he was unaware that she was coming to the United States and that she had not spoken with them the week prior to her visit.  During their visit, M.S.T. claims he called his mother a phony because her demeanor during those visits differed so much from her typical demeanor in Manchester.  M.S.T. also expressed anger at his mother for failing to email A.D.T. after the visitation as she promised, which upset the younger child.

The court also asked M.S.T. about a picture he drew, which was an exhibit at trial that featured a vampire dancing on two headstones, one of which read "Amor, Bad Mom" and the other of which read "Jamie, Bad Dad."  M.S.T. explained that he drew the picture following a fight with his mother over the phone regarding his return to the United Kingdom.  He stated that he wrote "Bad Mom" on the tombstone because he believes that his mother lied to him about the reason his father left South Africa.  M.S.T. also made sure to remind the court about an alleged event when he was six (6) or seven (7) years old when he became so angry at his mother for stating that their father was not coming back for them that he threatened her with a knife.  Petitioner denies that such an event ever occurred.  M.S.T. also stated with determination that if he was returned to the United Kingdom, he would find a way to get back to the United States with his father.

## IV. CONCLUSIONS OF LAW

The court concludes, pursuant to Fed. R. Civ. P. 52, that:

1. The Hague Convention was drafted to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, preamble. In furtherance of that mission, the Hague Convention establishes legal rights and procedures for the prompt return of children who have been "wrongfully removed to or retained in" a nation that is a party to the Hague Convention. Hague Convention, art. 1; ICARA § 11601.

2. The Convention applies to children under the age of 16 who were habitually resident in a state that is a party to the convention immediately prior to their wrongful removal or retention. Hague Convention, art. 4.

3. Both the United States and the United Kingdom are signatories to the Hague Convention. The United States has implemented the Hague Convention through the International Child Abduction Remedies Act ("ICARA"). 42 U.S.C. § 11601 *et seq.*

4. United States courts have concurrent original jurisdiction in actions arising under the Hague Convention. 42 U.S.C. § 11603(a). "The Convention and [ICARA] empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4). Accordingly, the court's inquiry is not what is in the best interests of the child as is typically the case in a child custody matter. *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 610-11 (E.D. Va. 2002), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002).

16

**Prima Facie Case for Return**

5.    To present a *prima facie* case under ICARA, a petitioner must prove by a preponderance of the evidence that the children have been wrongfully retained within the meaning of the Hague Convention.   42 U.S.C. § 11603(e)(1)(A).   Under the Hague Convention, a removal or retention is considered "wrongful" where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for removal or retention.

Hague Convention, art. 3.

6.   Therefore, in order to establish a *prima facie* case of wrongful removal or wrongful retention under the Hague Convention and ICARA, Petitioner must establish by a preponderance of the evidence that: (1) the children were habitually resident in the United Kingdom at the time of their retention by Respondent; (2) Respondent's retention of the children breached Petitioner's custody rights under the laws of the United Kingdom; and (3) Petitioner was exercising her custody rights at the time of the retention. Hague Convention, art. 3; *Abbott v. Abbott*, 130 S. Ct. 1982, 1989 (2010); *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009); *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001).

7.   "Habitual residence" is not defined in the Hague Convention.  *Miller,* 240 F.3d at 400. However, "there is no real distinction between ordinary residence and habitual residence." *Id.* (internal citation omitted).  Determining the children's habitual residence before the alleged wrongful retention is a fact specific inquiry, judged on a case-by-case

basis.  *Id.* Courts within the Fourth Circuit conduct the habitual residence analysis guided by a two-part framework.  *Maxwell*, 588 F.3d at 251. The court first examines whether the parents shared a settled intention for the children to abandon the former country of residence. *Id.* (citing *Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001)). Shared parental intent is determined from all of the evidence presented, not merely on the representations of the parties.  *Id*. at 252.  In cases '"where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period,' courts have refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence."  *Id.* (quoting *Mozes*, 239 F.3d at 1071). The court next analyzes the "extent of the child's acclimatization to the new country of residence."  *Id*. at 253.  The extent of the child's acclimatization is not merely a question of "whether the child's life in the new country shows some minimal degree of settled purpose, but whether the child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed."  *Id*. at 253-254. (internal quotations and citations omitted).

8.  At the evidentiary hearing, Respondent conceded that Petitioner met her *prima facie* case for a wrongful return and with good reason.  As to habitual residence, Respondent did not establish that there was a shared intent by both parents for the children to abandon the United Kingdom and move to the United States in December 2012.  Notwithstanding evidence of a prior shared intent in 2011 for the children to come live with Respondent in the United States, all of the parties understood the December 2012 trip to be a temporary visit with a definitive return date.  Additionally, the court finds that the children's four-

month stay in the United States is not sufficient to establish that they were acclimatized to their new environment such that returning them at this point "would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Maxwell*, 588 F.3d at 253-54 (quoting *Mozes,* 239 F.3d at 1081). Therefore, the court finds that the children are habitually resident in the United Kingdom.

9.   Respondent further stipulated at trial that Petitioner had rights of custody of the children under the Hague Convention and under the relevant law of the United Kingdom, and that Petitioner was exercising that custody at the time of the children's wrongful retention.   Under the Hague Convention, "rights of custody . . . may arise in particular operation of law or by reason of an administrative decision, or by reason of an agreement having legal effect under the law of that State."   Hague Convention, art. 3.   Here, Petitioner has rights of custody by operation of English law, and specifically the United Kingdom Children Act of 1989 (the "Act"),[7] which   provides that "[w]here a child's father and mother were married to each other at the time of his birth, they shall each have parental responsibility for the child."   Children Act § 2(1).   "Parental responsibility" as defined by the Act includes "rights of custody" as defined by the Hague Convention, and "American courts have interpreted Section 2 of the Children Act as sufficient proof of *de jure* rights of custody for a Hague Convention *prima facie* showing of wrongful retention or removal, at least where no English court order negating the petitioner's parental responsibility is in effect." *Haimdas v. Haimdas*, 720 F. Supp. 2d 183, 202 (E.D.N.Y. 2010).   Petitioner therefore has rights of custody under the Hague Convention.

---

[7] The court may take judicial notice "of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the Habitual Residence of the child." Hague Convention, art. 14.

10.  Petitioner was also exercising her custody rights at the time Respondent retained the children in the United States.   In the context of custody, the term "exercise" is liberally construed and will be found '"whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."' *Bader v. Kramer,* 484 F.3d 666, 671 (4th Cir. 2007) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1065 (6th Cir. 1996) ("*Friedrich II*").  While the children did not live with Petitioner for a two-and-one-half year period following the parties' divorce, Petitioner has had physical custody of the children and has been solely responsible for their care for the 20-month period following Respondent's relocation to the United States and prior to the children's travel to the United States.

11. Accordingly, the court finds that the United Kingdom was the children's place of habitual residence, Petitioner had custody of the children as defined in the Hague Convention and under the laws of the United Kingdom, and Petitioner was exercising custody rights prior to the children's trip to the United States in December 2012. Therefore, the court concludes that Petitioner has met her burden of proving by a preponderance of the evidence that Respondent's retention of the children in the United States was wrongful within the meaning of the Hague Convention.

12.  Upon a showing of wrongful removal or retention, the return of the child is required unless a respondent establishes one of the defenses available under the Hague Convention.  *See* Hague Convention, arts. 12, 13, and 20.   Even if Respondent proves that one of the exceptions applies, the court retains the discretion to order a child's return. Hague Convention, art. 18; *Miller*, 240 F.3d at 398.

13. Respondent in this case has raised two of the Hague Convention's exceptions: the "grave risk" exception pursuant to Article 13(b) and the "mature child's objection" exception, also pursuant to Article 13.

**Grave Risk Exception**

14. Under the grave risk exception, a respondent must establish that there is "a grave risk that [the children's] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." Hague Convention, art. 13(b). Respondent must prove this allegation by clear and convincing evidence in order to establish the exception. ICARA § 11603(e)(2)(B). The grave risk exception is to be narrowly interpreted, and the standard for establishing the existence of a grave risk of harm is high. *Miller*, 240 F.3d at 402.

15. Some courts have held that demonstrating grave risk requires a showing that the child would be returned to an environment in which the child would experience war, famine or disease, or that there exists the serious threat of abuse where the court in the country of habitual residence could not protect the child. *See Friedrich II*, 78 F.3d at 1060. Other cases have held that a respondent must establish by clear and convincing evidence a pattern of sexual or physical abuse of child or parent in order to invoke the Article 13(b) grave risk exception. *See e.g.*, *Danaipour v. McLarey*, 386 F.3d 289 (1st Cir. 2004). The Third Circuit Court of Appeals has held the grave risk exception applies only if the respondent shows "that the alleged physical or psychological harm is a great deal more than minimal [and] something more than would normally be expected on taking a child away from one parent and passing him to another." *Baxter v. Baxter*, 423 F.3d 363, 373 n. 8 (3d Cir. 2005). All courts agree that an Article 13(b) defense "may

not be used as a vehicle to litigate (or relitigate) the child's best interests.'" *Danaipour v. McLarey*, 286 F.3d 1, 14 (1st Cir. 2002) (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 FR. 10,494, 10,510 (Dep't of State Mar. 26, 1986)).

16.  In *Miller*, the Fourth Circuit held that the grave risk exception was not applicable where the "courts in the abducted-from country are as ready and able as we are to protect children."  The court further stated:

> If return to a country, or to the custody of a parent in that country, is dangerous, we can expect that country's courts to respond accordingly . . . . When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate.

*Miller,* 240 F.3d at 402 (quoting *Friedrich*, 78 F.3d at 1068).

17.  First, the court finds that there is no proof that the children have been exposed to any sexual abuse.  Additionally, the only allegation of any physical abuse involved a baby-sitter who the children claim hit them with a belt when the children were living with their mother in South Africa. A single event of abuse by someone other than Petitioner, who is also unlikely to see the children in the future, does not provide sufficient evidence that the children face a grave risk of harm if returned to Petitioner.  The court finds that Respondent's claim that Petitioner repeatedly forced the children to watch video footage in an effort to frighten them or psychologically torture them is not credible.  While A.D.T. mentioned being afraid of travelling to the United States as a result of video footage he had seen, M.S.T. did not mention such footage and reported that he had a very normal and pleasant plane ride.  Respondent's allegations that Petitioner regularly tells

lies about the father clearly would not rise to the level of psychological torture such that the grave risk exception would be applicable.

The remainder of the allegations, even if true would not be sufficient to invoke the Article 13(b) exception.  Many of Respondent's and the children's claims are, at most, allegations of poor parenting, including Petitioner's alleged drinking and smoking, her alleged use of foul language toward the children, and her alleged tendency to sleep late, which leaves the children to prepare their breakfast and ready themselves for school on their own.  Other allegations are those that could be made by many ten (10) and eleven (11) year-old boys in similar situations, such as the allegations that Petitioner's imposed punishment for small offenses is excessive, that they have no privacy, that their parents fight too much, and that one parent speaks ill of the other.

Respondent's complaints that Petitioner lets the children walk to school on a busy road and lets them go out at night by themselves does not establish that the children were or will be in actual danger in Manchester.  Furthermore, it is not this court's prerogative or its mandate in the instant litigation to determine whether one parent would be better than the other, or whether the environment offered by Respondent is superior to the environment offered by Petitioner.  *See Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000) (courts considering Article 13(b) grave risk exception "are not to engage in a custody determination or to address such questions as who would be the better parent in the long run.")*; see also* Hague International Child Abduction Convention; Text and Legal Analysis,  51 FR 10,510 ("'intolerable situation' was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State.").

Finally, even if these allegations of mistreatment, either individually or collectively, caused the court to be as concerned as Respondent apparently is, the alleged mistreatment would still not meet the standard as outlined in the Fourth Circuit's decision in *Miller*, since a court in the United Kingdom can be trusted to adequately respond to these issues and provide protection for the children. *See Miller*, 240 F.3d at 402.

**Children's Objection – the Age and Maturity Exception**

18.  Article 13 provides that the court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take into account its views." Hague Convention, art. 13.

19.  The respondent bears the burden of proving the applicability of the age and maturity defense by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(2)(B); *Haimdas*, 720 F. Supp. 2d at 204. This exception, like the others recognized by the Hague Convention, is to be applied narrowly. 42 U.S.C. § 11601(a)(4). While the Hague Convention provides that a court may take into account the views of the children, it is not required to accede to those views. *Haimdas*, 720 F. Supp. 2d at 204. The exception is discretionary. *Id*.

20. "There are no established objective criteria or tests for assessing 'maturity' in the context of the mature child exception." *Id.* at 205 (internal citation omitted). The Hague Convention provides no specific age at which a child is deemed sufficiently mature such that his opinion must be considered. *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279

(3d Cir. 2007).[8]  "Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007).

21.    Additionally, the court must distinguish between a child's objections as defined by the Hague Convention and the child's wishes as in a typical child custody case, the former being a "stronger and more restrictive" standard than the latter.  *Haimdas,* 720 F. Supp. 2d at 206.  Where the particularized objection is "born of rational comparison"

---

[8] Notwithstanding the fact that a specific age of maturity is not set by the Hague Convention, the court notes that children similar in age to the children in this case have been found not mature enough to warrant consideration of the child's objection.  *See Yang,* 499 F.3d at 279 (finding a ten-year-old considered a border-line genius was not of sufficient age and maturity for her views to be taken into account); *Tahan v. Duquette,* 259 N.J. Super. 328, 613 A.2d 486, 490 (1992) (holding, without discussion, that the maturity exception "simply does not apply to a nine-year-old child"); *Haimdas,* 720 F. Supp. 2d at  208 (finding a nine-year-old two months shy of his tenth birthday was "hardly sufficiently mature" for the Court to take his views into account in deciding whether or not to order his return); *but see Lopez v. Alcala,* 547 F. Supp. 2d 1255 (M.D. Fla. 2008) (finding that a ten-year-old had reached an age of maturity, but ordering return because the child's fears regarding return were unfounded).  Cases where courts have found children of similar age to the children in this case to be mature typically involve additional extenuating circumstances or the interaction with other provisions of the Hague Convention, and such cases do not necessarily result in the court declining return. *See e.g.*, *Blondin v. Dubois,* 238 F.3d 153, 167 (2d Cir. 2001) (finding that the district court properly considered the views of an eight-year-old child as part of its "grave risk" analysis, but did not reach a decision as to whether her objections alone would have been sufficient to support a denial of return); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1362 (M.D. Fla. 2002) (taking into account opinion of a nine-year old boy but finding his opinion not conclusive given his lengthy stay in the country of wrongful retention and ordering return in furtherance of the Hague Convention's aims); *Matovski v. Matovski*, 06 Civ. 4259 (PKC), 2007 WL 2600862 (S.D.N.Y. Aug. 31, 2007) (considering the objections of a twelve-year-old and an eleven-year-old in denying return in conjunction with a finding that the children were well-settled in the place of wrongful retention pursuant to Article 12 of the Convention, but denying return); *but see, Anderson v. Acree,* 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002) (finding that an eight-year-old child's objection to a return furnished an independent basis for the court not to return the child, but relying also on a finding that the child was well-settled in her new residence for 22 months pursuant to Article 12 of the Convention).

between a child's life in the country of wrongful retention and the country of habitual residence, the court may consider the child's objections to be a mature objection worthy of consideration.  *See Castillo v. Castillo*, 597 F. Supp. 2d 432, 441 (D. Del. 2009).  The defense does not apply if the "objection is simply that the child wishes to remain with the abductor."  *Application of Nicholson v. Nicholson*, 97-1273-JTM, 1997 WL 446432 (D. Kan. July 7, 1997); *see also Haimdas,* 720 F. Supp. 2d at 208 ("[child who was nearly ten years old] sees this as a choice of which parent he wants to live with, not which country he wants to grow up in; his stated preference to remain in New York is not a particularized, mature objection that should be part of the Court's Hague Convention analysis.").  Giving consideration to such wishes would place the court in the position of deciding custody, which is explicitly not the mandate of a court hearing a wrongful retention case under the Hague Convention.  *See Hazbun Escaf,*  200 F. Supp. 2d at 615 (finding that to accommodate [13-year-old's]  preference to stay in the United States and spend more time with his father "would be a custody determination that is not at issue in a Hague Convention petition").

22.  Further, a mature "child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child."   Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-01.  Undue influence may not be intentional, but simply the inevitable product of an ongoing custody battle between two parents.  *See id.* (recognizing the potential for "brainwashing" of the child by the alleged abductor.).  Alternatively, the very fact of "a lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings," which may influence the

child's desire to remain in the new home.  *Yang*, 499 F.3d at 280.  Allowing the influence of an abducting parent to taint the child's preference, either by virtue of statements made to the child or by virtue of the lengthy wrongful retention would frustrate the Convention's overarching purpose of preventing the abducting parent from obtaining custody by means of a wrongful removal.  *Id*. at 280.

23. With these considerations in mind, the court finds that Respondent has not proved by a preponderance of the evidence that the children are of an age and maturity such that their wishes should be taken into account in determining the issue of return.[9]  Both M.S.T. and A.D.T. are polite, smart boys.  Notwithstanding the impact on the children of the instant custody matter, neither boy seems to be especially sophisticated or to have reached a maturity beyond their years.  *Cf. Application of Blondin v. Dubois*, 78 F. Supp. 2d 283, 296 (S.D.N.Y. 2000), *aff'd sub nom. Blondin v. Dubois*, 238 F.3d 153 (2d Cir. 2001) (finding that child objecting to return to an abusive father was "a remarkably mature eight-year-old, probably in no small part due to the very adult proceedings and issues that she has been confronted with over the past two years.").

24.  Even if this court were to find the children sufficiently mature, other factors would weigh against declining to issue a return.  First, the children have expressed a preference to remain in the Greenville area rather than a strong objection to returning to Manchester.  *Haimdas*, 720 F. Supp. 2d at 206 ("A child's expression of a preference to remain in the

---

[9]  The burden of demonstrating maturity lies with the party asserting the defense. Respondent provided no expert evidence or expert testimony regarding the children's maturity level.  Even Respondent's own testimony as to the children's maturity was conflicting; while he stated that the children were mature enough such that their views about where and with whom they wished to live should be taken into account, he also testified that the children did not make independent decisions regarding their daily activities and lifestyle.  Further, Respondent repeatedly complained that Petitioner gave the children too much freedom in their daily lives and let them do as they please.

United States rather than a particularized objection to repatriation may provide a basis for a court to find the mature child exception inapplicable"). The children's objections to Manchester mostly involve an aversion to the rainy climate and a lack of places to play. However, both children mentioned that they enjoyed playing sports at their school and the overwhelming evidence suggests that the children were involved in at least three sports teams or clubs. Surely, then, the children have adequate places to play and are not completely deterred from doing so by the climate in Manchester. Additionally, both children stated that they had friends in Manchester and both stated that they liked their teachers at school. Both children also commented on the fact that the people of Greenville were on the whole very friendly as compared to the people of Manchester. The children's preference for the temperate climate and southern hospitality of Greenville, as well as their affinity for their father's yard, is not sufficient to invoke Article 13's narrow exception. *See Locicero v. Lurashi*, 321 F. Supp. 2d 295, 298 (D.P.R. 2004) ("The fact that the [13-year-old] child prefers to remain in Puerto Rico, because he has good grades, has friends and enjoys sport activities and outings, is not enough for this Court to disregard the narrowness of the age and maturity exception to the Convention's rule of mandatory return."); *Yang*, 499 F.3d at 279 (ten-year-old girl's affinity for her school, her preference for living in a house rather than a small apartment, and having friends and brothers was not sufficient for the court to invoke the "wishes of the child" defense under Article 13).

25. Furthermore, the children's preference for Greenville over Manchester cannot be "born of rational comparison" between life in the United States and life in the United Kingdom. *See Castillo*, 597 F. Supp. 2d at 441. While the children have been in the

United States, the children have not been in school.  From their *in camera* testimony, it appears that the children have clearly been having fun playing with their father, watching crime dramas on television, and exploring the city's attractions and restaurants.  Even if the children were mature enough to make a decision about where they wished to grow up, neither child has offered well-considered reasons why staying in Greenville would be preferable or beneficial that are not related to their leisure and pleasure.  *Cf. Castillo*, 597 F. Supp. 2d at 441 ("child expressed particularized objections to returning to Colombia, pointing out that, in Colombia, she received little help with homework, performed poorly in school  . . . was often unable to play outside due to safety concerns, spent much of her time at home alone, and had few friends").

26.  In addition to their stated desire to remain in Greenville, the children also expressed a desire to stay with their father.  The court does not wish to discount the children's desire to remain in the United States with their father; clearly their desires are deeply felt.  The children were not simply parroting one parent or the other.[10]  However, it is clear to this court that the children have been influenced by their parents' bitter and contentious relationship.  At present, the children side with their father and believe that their mother lied when she told them that Respondent left the family and South Africa for another woman.  Both children mentioned this alleged lie during their *in camera* testimony, leaving little doubt that this perceived breach of trust lies at the heart of the children's animosity toward their mother.  The fact that they have been physically separated from their mother for the last four months while the instant custody battle has ensued, during which time Petitioner has sought to insulate the children from the stress of the

---

[10] The GAL similarly stated that the children's opinions were their own.

proceedings by not discussing the issue with them, surely has exacerbated the children's confusion about the situation and negative feelings toward their mother.

27. Additionally, the impressions of the children's teachers and the parents of the children's friends, which were gathered via email by the GAL and submitted into evidence, suggest that the children were happy in Manchester and had a good relationship with their mother. The head teacher at the Norden School reported that the children were happy and cheerful, that the children were talented sportsmen and widely involved in the school's sporting teams, and that Petitioner was fully involved with the children's school life. Neither the head teacher at Norden nor the children's teacher at their after-school club had seen any evidence of bullying nor did they report any disciplinary issues. Interestingly, the head teacher at Norden School reported that M.S.T. expressed concern about seeing his father again during the Christmas visit because Respondent had been very strict with the children and had beaten them in the past. These particular allegations against Respondent need not be confirmed. It is sufficient to note that the statements from those involved with the children's life in Manchester stand in stark contrast to the picture painted by Respondent and now reported by the children about the children's home life in the United Kingdom. Such contradictions provide further circumstantial evidence that the children's objections to the return have been influenced by either their parents or the events surrounding the instant custody dispute, which therefore counsels against giving the children's objections determinative weight.

28. Ultimately, the court finds that the instant dispute is a custody matter involving the children's preferences with regard to which parent they want to live with, not well-reasoned particularized objections to their return to their place of habitual residence. To

the extent there is an irreparable rift between the children and their mother that would counsel toward placing the children with their father, a family court is in a better position to determine such matters. Petitioner's expert, Simon Craddock, offered testimony that family courts in the United Kingdom routinely conduct in-depth investigations into such custody disputes which include lengthy interviews with the children and all parties involved that are conducted by social services professionals and family law experts. It is through that kind of deliberate and careful process that a court can conduct a best interest analysis or the English equivalent, which these children deserve. That analysis is simply not the proper inquiry on cases of wrongful retention under the Hague Convention.

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Petitioner Paulina Amor Hirst's Verified Petition for Return of the Children [Dkt. No. 1] is **GRANTED**. The children, M.S.T. and A.D.T., shall be returned to the custody of Petitioner on Saturday, May 4, 2013, for their return trip to the United Kingdom.

It is **FURTHER ORDERED** that the children's Passports will be returned to the custody of Petitioner's local counsel who will deliver those passports to Petitioner prior to their return flight to the United Kingdom.

It is **FURTHER ORDERED** that Petitioner is permitted fourteen (14) days to file an application for attorneys' fees and expenses, and Respondent shall have fourteen (14) days to respond.

The court strongly recommends that Petitioner devote herself to the well-being of the children, who have quite obviously suffered some amount of emotional pain as a result of their parents' divorce and the ensuing custody battle. The court strongly

encourages Petitioner to seek individual and family counseling for the children as her counsel suggested she would do if the Petition for Return was granted.

**IT IS SO ORDERED.**

_J. Michelle Childs_

United States District Judge

May 3, 2013
Greenville, South Carolina